All right, I think we can proceed now to the second case for this morning, Glisson against the Indiana Department of Corrections and others. Mr. Sutherland. Chief Judge Wood, may it please the Court, my name is Michael K. Sutherland of Michael K. Sutherland & Associates, and we are representing the estate of Nicholas Gleason. Gleason is before this en banc panel to persuade the judges, to persuade this Court, that he has met his burden of proof under the summary judgment standards and can hold Corizon liable under 1983 employing Monell theories. Mr. Gleason died October 10, 2010. He was 50 years old. He was in prison 39 days in the custody of the Indiana Department of Corrections and under the medical care of Corizon. He died of starvation, renal failure, and other complications. He, when he was on the outside taking care of himself, was his own director of a specific plan, treatment plan. When he was in charge, he made it to the doctors, he made it to the patients up, he took care of himself, he was meticulous about his hygiene. There is a detailed description of his medical history and the medical problems that he presented when he was taken into the custody of DOC when he walked through the prison gate. It is set forth in the decision of February 17, 2016. Mr. Sutherland, what does the record tell us about Corizon's decision not to adopt a policy along the lines called for by the Department of Corrections directive on chronic disease management? The record in this case tells us that Corizon, when asked about adopting the medical service care directives, indicated they did not adopt any of them and that they chose to do so because they were going to rely on best medical practices. What we know is that they didn't come up with any alternative. What I have to assist the court in that, I went back through all the medical directives. The very first one, 1.01, says compliance with the health care service directives is mandatory. So contrary to their position, all the health care directives were mandatory. They had to adopt them or, as it goes on to say, if there is a problem on this, counsel... I'm puzzled by the emphasis on this. You can't use the Constitution to enforce state administrative directives. There might be a claim under state law, but I don't see how this creates a claim under constitutional law. Well, it contradicts them, Your Honor. It impeaches them. They said they didn't have to have, they didn't have to adopt any of the policies. And the contract that they have with the states is just the opposite. I assume, given the nature of this litigation, they are saying that the Constitution does not require particular policies. I don't see how the fact that the state requires something means that the Constitution requires something. Your Honor, if their defense was that they didn't have to come up with a specific treatment plan that was controlled or directed, and that's just the way it is, then that is an analogy of saying we had a duty to feed the inmates, and even though they starved to death, we met our obligation by feeding them something. So in this case, when Mr. Gleason presents with a whole plethora of serious medical problems, and they decide not to have any treatment plan, any specified treatment plan, then that indicates... Maybe my question isn't clear. I can understand an argument that the Constitution of its own force requires such a plan. I understood that to be the argument Chief Judge Wood was making in dissent. I just don't understand how it counts for or against that argument that the state has made such a requirement as a matter of state procedure. Monell gives you many options to prove 1983 liability if you want to hold a municipality liable. This court in 2010 in the Minnick's case indicated that liability can be visited upon contract groups such as for-profit corporations like Horizon. Right. So Mr. Southerland, let me take you to page 47 of your brief, your opening brief, where I think you, at least I understood you to be articulating the theory that I discussed before, because there you say that CMS maintained an express policy of fractured care, specifically that there was an intentional gap in the policies, and then a little further down you say they intended... So the directive is of relevance only to the extent that you're wondering do they know about something. It's not because it's Indiana law or anything, as Judge Easterbrook says. That isn't the Constitution. States can do all sorts of things. But you've said they adopted a policy of diffusing responsibility for medical needs. And the question is, is a policy of, maybe it's an unfortunate word, fractured care, something that leads to deliberately indifferent outcomes. I mean, with policy cases like Monell cases, it's not quite the same as a doctor saying, I don't care what happens to you, why don't you just die on the floor. The policy itself has to lead to deliberately indifferent outcomes. And I thought that part on page 47 is where you were articulating the constitutional claim. Your Honor, we are. There are two ways, I think, under Monell that Gleason has shown that we can hold Coriazen liable under the burdens of summary judgment. Now, we're not talking about eventually. That is not our obligation at this point. But one is, if there's a specific certainty that a policy is required, and that policy that we're talking about is so obvious, is the need to have a specified individualized treatment plan, then they have a duty to come up with one. Well, or to put it the other way, they thought that, I guess, spot market transactions is all I can think of as a way of saying this. Individualized encounters with healthcare providers without any kind of captain of the team, you know, making sure they get coordinated was an acceptable way to run their medical services. So we can call that an acceptable policy. If that's the policy you're going after, then I would say it appears from the briefs that maybe there are disputed issues of fact. The state seems to say that in the electronic records chronic conditions are recorded. You're saying nobody's getting them. Maybe that is a disputed issues of fact. But I think for Monell, somehow or another, you've got to show that the entity, and in this instance it's Corazon, has a way of doing, a deliberate way of doing business, which we can call a policy, that leads to deliberate indifference. Well, there are two ways, as I said. If the need is so obvious, and in this case the need to have individualized treatment plans is so obvious, that they set out a four-paged memorandum in the DOC healthcare directives. That's one suggestion that it's so obvious. The other is common sense. Well, the Corazon knew. You have to show for part of a deliberate indifference claim that they know. So I can see all sorts of things being perhaps evidence of knowledge, but that's the most I think you can get out of the directives. This directive was in existence for seven years and they never corrected that. So they knew. Were they drafted by medical people or what? All of these directives were drafted by DOC, Department of Corrections, and they were required to be implemented by Corazon as part of their contract. But the source of the directives, are they medical or is it just some non-medical prison official deciding this would be a good thing? I mean, obviously, in determining whether doctors are being minimally or deliberately indifferent to patients' health, this depends on what the current state of medical knowledge is, right? So these mandatory directives you mentioned, these could be medical, these could be up-to-date responsible medical directives, or they could be some kind of bureaucratic thing. When a person presents themselves to the Department of Corrections, the department has an unqualified obligation to take care of that person no matter how he presents himself. Well, but no, I think you're not getting Judge Posner's question, and you may not know the answer to who seven years ago in the Department of Corrections created this. Did they go find a physician to write them? And if you don't know, that's okay, you can just say you don't know. But I think that was the question. Okay, well, I'm not sure that the contract is in evidence, but I do know the answer to that, and that is that there's a multiple-page contract that was signed and renewed periodically, and that was signed by the officials, the highest officials in Khorizon, the Attorney General, and other departments' heads that had to sign off on this for the state. And that has been renewed periodically ever since, and it also references attachments and exhibits which they are obligated to abide by. And one of them, we presume, is this directive, health care folder of directives, which is several hundred pages. So it addresses everything from mental health issues to creating a mortality or morbidity review so that they can change the policies and practices if they have failed. None of that was followed. None of it. What physicians were involved in drafting this whole overriding document? What physicians were involved? The document has the author of each and every directive, and it is a person within the Department of Corrections. You keep missing the point completely, started with Judge Easterbrook's question. Is there any medical input into these mandatory directives? Yes. There's a committee that put, as I understand the information, there was a committee that put... A committee of doctors? Sorry? A committee of doctors? I'm sorry, Judge, I don't have... A committee of doctors. Doctors. Doctors. Are doctors on this committee? Professionals. Yes. Yes. This was put together... Why does that appear in the record? If you could step back to the microphone, that would help too. Step back. I got it. All right. All right. Maybe I'll let you think about that for a minute because I want to go back to a point that was... I mean, it's really a critical point for Monell cases. There are a couple of different ways of proving that it is actually the policy of the entity, the municipality or the entity like Corazon. One of them is, of course, a written policy that says, it is our policy to ignore everybody, or one of them is a decision maker, a final decision maker does something. One of them is custom, and certainly if it's custom, then you can't prove custom by one incident only. You have to prove custom by a number of incidents. Which one do you think you are trying to prove, and how can you... Do you think you need numerous incidents if you're actually trying to show that there's an unconstitutional policy? No, we have not advanced that type of case in this instance, Your Honor. What we're showing is that there's two ways we've shown it. One is that the need for such a policy to have an individualized treatment plan is obvious, and with moral certainty, anybody who fails to have a treatment plan in place that takes account into the elements that Mr. Gleason had, he had a stomach... It's a policy, as you say here in your brief, of diffusing responsibility, and you're saying that's an unconstitutional policy. The fact that they didn't... There's two ways. If they didn't have a policy, which they say they didn't, they just simply followed accepted medical practices. Well, the accepted medical practices on the record says there was no policy in place because they didn't track all the problems that Mr. Gleason had, didn't track the lack of his oxygen, didn't track any of these other things. I don't really understand all this business. Isn't this just a deliberate indifference case where you look at this guy and you realize he's in terrible shape and he needs medical care, and that's what deliberate indifference is. You know that someone has medical needs that are serious, and you don't do anything about it. Isn't that what cases like this come down to? These kinds of cases do come into the courtroom with some regularity. The test, of course, is to demonstrate whether or not there was willful indifference under the Eighth Amendment. And you have to show in this instance, since you have conceded, or at least as the case now is before us, none of the individual medical providers, whether they were doctors or nurses or whatever they were, in and of themselves were being deliberately indifferent. You're saying that the deliberate indifference stems from the way Corazon runs itself. That is correct. And the Thompson case sort of confirms that you don't have to have individual medical providers demonstrate their willful indifference. If the whole system is corrupt and fractured and compartmentalized so there's no coordination, you're not going to have any success rate with somebody with medical problems like Mr. Gleason. But when he was on the outside, he took care of himself. He mowed the grass the day before he was taken into custody. He was meticulous about his hygiene. He took care of his mother and his brother. He took care of himself. But it was a death sentence to send him to prison with a fractured program that they had where they bounced all over the place on whether he was competent, whether he was getting his food. Nobody monitored this stuff. Can you imagine going into the hospital and they say, hey, you're 129 pounds, you just lost three pounds. Does that mean anything? Nobody made a point of that. What about your oxygen going up and down? Anybody look into that? No. He had a neck brace that they didn't deliver. He couldn't talk. You're saying that the individual doctors and nurses, they were not deliberately indifferent, but Corazon was as an institution? The need for an individualized treatment. Answer my question, would you please? The individualized doctors that we looked at, the individual doctors we looked at, we could not find in the record any evidence that they were willfully indifferent. Right. Okay. And we're not going down that route. What you're saying, I take it, is that Corazon made a calculated choice not to do anything. If you have coordinated care, you're going to have to spend some more money to have somebody in charge of that treatment plan. And that's what the directive says. It also, many of the other directives say that somebody should report back if it's not working. And you might have linked together the starvation, the renal failure, and the lack of oxygen perfusion with the mental problems that they're sending him off to the psych ward for. That there are physical reasons for his mental deterioration. Yeah, I mean, they were so uncoordinated. At one time he was referred to the psych ward, another time he was put in general population, he wasn't there 24 hours, and they sent him back because he appeared to be unstable. Counsel, I'm interested in how this, how the argument you're making compares with the medical norm out of prison. When did it become normal for, say, a good teaching hospital to have one central administrator in charge of each patient's care? When did it become the normal? Right. Out of prison. I think the normal has been forever that you have... I'm sure forever is not a good description of Greek and Turkish and Roman practice. I would like to know, out of hospitals, when did this become the norm in the top echelons of American care? Here's what I understand from medical practice without... You may not know the answer. I'm not asking you to make anything up. Do you know the answer? I don't know the date, if that's what you're asking. That's why I ask when. Okay, but I can tell you currently, and 10 years ago, and 20 years ago. Look, I'm not doubting that this may be the norm now, but do we know when? I suspect this is a recent invention. It isn't. Well, then I'd like to know when, and then what I would like to know is whether there is any research on the question whether this improves health outcome for patients. Do we know that it does? There are many articles I've read, which we have not included in the record, which suggests that the prison population, which is over... Look, I'm not asking about prisons. I am trying to get a focus on how medical care is handled outside of prisons in the best teaching hospitals. At Northwestern University of Chicago. Those hospitals, coordinated care is the word. That's a treatment plan. Do we know when? Apparently not. Do we know of any research about whether this improves health outcomes? Common sense suggests that if you coordinate things, if you're asking for data, I thought I've answered that. I don't have a data. We know that that practice had at least filtered to the Department of Correction when it issued the directive in question here, correct? That was based upon their best medical judgment of what they should... Seven years before Mr. Gleason shows up, the Indiana Department of Corrections thought that was best practice. I defy anyone to go to a hospital who isn't asked, who's your primary care physician, who is supposedly the coordinator, but whether that happened in 1975 or whether that happened in 1995, I don't know, but I think Judge Hamilton's point is a good one. Mr. Sutherland, it seems to me that the state's directive here strengthens your case, but I'm not sure your case depends upon it. I had understood you to be arguing not only that... When we look at all of these methods of proof, multiple incidents that are similar with a failure to respond to them, an explicit policy, the failure to respond to the directive here, we also have, it seems to me the Supreme Court has told us, for example, in Canton against Harris and Farmer against Brennan, that a danger can be so obvious and so serious that the state actor, and in this case Corison, just has an obligation to deal with it. I understood you to be saying that even without the State Department of Corrections' directive, for medical care, particularly with aging prison populations, the problem of chronic complex cases is so obvious and so serious that even the State Department of Corrections saw it here. Well, I am saying that, Judge, but I'm also saying that part of the proof that it is so obvious is this lengthy treatment plan directive, which they originally say we are not bound by. So they have made choices, conscious choices, to do something other than what they were told to do. And that conscious choice led them to impose a policy or have a policy which was not in writing anywhere. And the policy that we are talking about would have been, if they had followed it, Mr. Gleason would probably be alive. So my belief is that that is one reason. The other one is that there is a whole bunch of training cases that suggest that if there is an obvious need to train and the decision maker or the policy maker refuses to create a training policy or have a policy in place, for example, extracting mentally ill patients or mentally ill inmates, then that training is so obvious that they should have done that. That is a situation which doesn't require comparators. So we think that this is the two reasons that we have for demonstrating that under Monell that Corizon has deliberately chosen not to have a policy, one, and the second is that the policy that there is such an obvious need for a policy that they should have implemented a policy for individualized treatment plans. So to that second point, if DOC had not had directives, we would have a constitutional violation in your view today? I think you would have because you still have to show, at least potentially show, that there is a willful indifference to the obvious medical needs. Well, I thought looking at, perhaps I misunderstood you, but I thought earlier you mentioned looking at the individual medical care that he got, you didn't see evidence of that. If Corizon had their own individual treatment plan or they had demonstrated an individual treatment plan, coordinated plan, even if it wasn't in writing, then we wouldn't be here, but they did not do any of that. I thought you meant to say, you know, when somebody is giving him one medication, not knowing what the other treatment has been leading up to that, that you weren't necessarily accusing that doctor, but then with nobody able to step back and look at the full picture, I thought that was all you were saying, that none of the doctors, in and of itself, did anything wrong. That's what I was saying. If you go through the entire 39 days, each of those doctors was doing something that their discipline suggested they needed to do and reporting something back, but there was no attempt to forward that information to anyone else, there was no attempt to monitor the history before he even got, or get the history before he even came to the prison, a very fundamental requirement if you are going to understand what sort of medical problems that person had and how he dealt with them. He had a stoma and he had a speech box, he could not talk very well. So you would think that they would sit down and try to really figure it out by looking at his doctor's records, Dr. Germina didn't get those until he came on the case a week or so before he died. So does that show deliver in differences that they didn't follow up? It could be. It could be. If you have a serious medical patient and he has all these problems and the obvious thing to do is get the history so you know how to come up with a treatment plan, I'd suggest that's willful indifference, or at least it's an argument we can make to a jury, but we have to get by summary judgment and the burden under summary judgment is just to show that there are material issues of fact which allow us the inference, the inference in our favor to get beyond summary judgment so we can talk to a jury. Well, it sounds more like malpractice than deliver in differences. Well, it's not malpractice, it could be both. And as the court knows, there are multiple theories you can have against any of these individuals. So in the doctor's case, it could be malpractice. But in coercion, it's not because they're not part of the fund, you'd sue them simply on negligence. And you might even have respondeat superior there. Secondly, just if you have a guard and he goes off on an inmate, you can sue him under 1983, but you also have a state cause of action for battery. And guess what? That is respondeat superior. There are a number of theories. In the malpractice, there are caps. One of the reasons people go to 1983, they don't have to worry about caps. And malpractice, there's no fee shifting and there's no punitive damages. But it's harder because you have to show that it's deliberate indifference, that it is in essence a form of punishment. That's why the Eighth Amendment comes in. An obvious medical need that they ignore willfully. And that's what the requirement is. And we think the obvious medical need is this totality of medical problems which can only be addressed if you have a treatment plan, an individualized treatment plan. I'd like to reserve the remainder of my time. If you'd like to reserve a little time, that's fine. Thank you. Thank you. Mr. Moore. Thank you. Good morning. My name is Richard Moore and I represent Correctional Medical Services. Just as a matter of housekeeping, I'd like to clarify that the entity that I represent as identified in the lawsuit is Correctional Medical Services or CMS for the name Corizon used a couple of times in court this morning. And that is a successor company. I think for purposes of the oral argument, it doesn't make a difference how we refer to the entity. But I'll be saying CMS because that's how I briefed it and that's how I understand it. Is there a material difference? Did Corizon succeed to CMS? They did, Your Honor. There's no material change with respect to whether we're referring to the entity as Corizon or CMS. Is there such a company today as CMS? I don't believe the company actually exists. You're asking me a question that I'm not entirely sure about on the record. Update the caption of the case if the one company has disappeared and another company has come into existence. I think the answer to your question for purposes of this lawsuit is that Correctional Medical Services remains a company that a judgment can be collected against and satisfied. Okay. Well, we'll see if we need to worry about that. Okay. This case really presents the question of whether medical care that's provided in the prison context that the record suggests was frequently insufficient from the perspective of state law negligence also rises to the level of a Monell violation. Right. What I wanted you to talk about is this policy question because we all start with, I suspect, a lot of common ground about what Monell said. It's not a case that was decided yesterday. So the question is whether one can speak sensibly of a policy when somebody has decided to take what I was calling kind of a laissez-faire point of view and not all policies would be vulnerable to a charge of deliberate indifference, but if that step could be taken, whether in the medical setting a policy not to have one coordinating physician is something, at least for the chronically ill, and I gather this case is limited to that set of people, is something that could be branded deliberately indifferent approach. I'd like to try to answer that question in two ways. The first way is to take your question as you phrased it as a hypothetical. I think the answer is not on the record in this case. I don't think that the record in this case... Well, that's not a hypothetical. You're talking about this case. The reason I say it's a hypothetical is because I don't agree that the evidence supports your premise either. Well, so why is it that CMS, I mean, I guess maybe there's a disputed issue of fact. You added some information in your response to the petition for rehearing that I had not seen in the record before that. But why isn't it, if you go seven years and you say we just don't think it's necessary, we don't want to have a policy on coordination of care, why isn't that a conscious decision? Was it an accident that CMS just sort of never read the, never chose to do this? Again, I'd like the opportunity to answer your honor in two different ways, because I believe the way that you are couching the question is itself not supported by the record. I don't think that the record supports the conclusion that there was a failure to act upon this chronic care health services directive over the course of seven years for any offender within the Indiana Department of Corrections. I don't understand the answer to your interrogatory then. It seems to me maybe we have a disputed issue of fact. I can certainly imagine you following through on what you just said at a trial, and we don't know what the outcome of a trial would be. But why isn't there evidence in this record, starting with the answer to the interrogatory, which is a much more general answer than what specifically happened to Mr. Gleason? If there is, I'd like to read what I view as the controlling portion of the answer. And again, it's not a sworn interrogatory. I don't want to overstate the distinction, but this is not sworn testimony. You're not responsible for your interrogatory. It's not admissible against you? Your Honor, that's not what I intended to suggest at all, if I can clarify. Please. My point is this response is not an interrogatory response. It is a response to, under Trial Rule 33, this is a response to a request for production under Federal Rule of Civil Procedure 34. Again, I'm not saying that to federally take responsibility. It's an admission of your party. I'm sorry? It's an admission of your party. It's a statement on my party's behalf about what we have in response to the request for production. So it's admissible against you? Sure. It's admissible generally. Thank you. But the response is that Mr. Gleason's medical care and treatment at IDOC were based on standards of medical and nursing care and generally were not dictated by written policies, procedures, or protocols. IDOC does implement health care services directives, but generally none of those directives were relied upon in rendering care and treatment to Mr. Gleason. The words that I used there, when I directed the response, have a very specific meaning. The question that we were asked is were there health care services directives that were relied upon in developing a course of treatment for Mr. Gleason. But why isn't that an admission that a particular directive, such as, you know, here's how you need to manage the chronically ill, you've said you're not following it? Maybe because you didn't think you needed to? I mean, again, we're at an early stage of this case. The discussion that we're having now is the reason that I characterized this issue as a semantic issue. It's not a semantic issue. It's very important because if you don't think it's necessary that the chronically ill have one person responsible for a plan, I mean, the directive actually seems quite sensible to me, even though it's not really what we're discussing here. Well, interestingly, the directive itself doesn't mandate that a single person be responsible for quarterbacking an offender's treatment plan. That's just absent. That's nowhere in the directive at issue. Well, the directive is talking about coordination of care, though. And just to take an example, that's obviously not happening because when they are thinking of sending him to the psych ward, they overlook the obvious possibility that there could be physical problems for his confusion, physical problems lying behind his mental deterioration. That happens all the time. I mean, sometimes mental deterioration is purely a mental illness. Sometimes it's physical. What shows up in this record is that he's got some really serious problems. People with not enough oxygen in their brain aren't thinking well. The health care services directive at issue actually starts off by indicating that offenders with serious chronic health care conditions do need to receive planed care in a continuous fashion. If the suggestion is made that CMS disagrees with that statement or is disavowing that statement, then let me correct that now. CMS is not. But you're not relying on it. And it was not relied upon in the care of Mr. Gleason, right? It was not relied upon. That's what you said in the Rule 3 core response. If I may attempt to answer the question because I want to address this concern, the second paragraph of the substantive portion of the guidelines, the second sentence is, the care itself should be consistent with community standards of practice in Indiana and in correctional settings across the United States. That's fine. I mean, that's an aspirational statement. You know, I'm sure you weren't going to say the opposite. What was your policy for the chronically ill? And your policy for the chronically ill didn't seem to involve the kind of however it gets done through electronic mechanisms, through a single person, through an administrator, through however it gets done. There was no coordination of Mr. Gleason's care, no serious effort to get his history, no effort to reach out to his mother when he's supposedly spitting. So how does that happen? Again, at the risk of being pedantic, Your Honor, I can read the medical records that reflect that on the first day that Mr. Gleason arrived at prison, there was an elaborate documentation of his medical history and an assessment of his medical and mental health condition. There was an identification of the medications that he was on. No, I'm familiar with those records. I'm sure every person here is. So we need to see, though, is the way this company, CMS, Corizon, whatever they're supposed to call them, running their delivery of medical services to the chronically ill something that is consciously indifferent to the outcomes for these chronically ill people. Uncoordinated, not the kind of care you would expect when you're in an institutional setting. Let me respond to that by initially accepting the assumption that the Health Care Services Directive dealing with chronic care was not consciously implemented or was not implemented. Your statement is correct. At the record, at the moment, we have to take your statement as a concession. I'm going to change your question, Your Honor. What? I misunderstood. I'm saying right now, at summary judgment, we are going to construe the facts in the light most favorable to the non-moving party and reasonable inferences from those facts, and your answer to that Rule 34, whatever it was, thing, suggests that there was a conscious decision not to bother to have any coordination. Now, let me ask you the same question I asked to your adversary. Forget prisons for a moment. Look at America's top teaching hospitals. Do we know when they adopted a principle that there would be a central coordinator of care for patients? I can answer that question from a semi-educated perspective, Your Honor. I mean, you know, my understanding is that From your own experience or from this record? From professional experience, not from this record, but we haven't been super bound by the record yet. My understanding is that when people go to the top teaching hospitals, they go for particular conditions as opposed to a series of chronic care needs. You're asking a question about when. Do we know when something happened? You may not know when. And the related question is, do we know what the consequence of this policy is? And let me make it clear the significance of this for you. Suppose hospitals have adopted such policies, and suppose they adopted them in the 1980s and then studied them. And then suppose you discover that when there's a central coordinator of care, patients live twice as long as they do when there's not a central coordinator. And your client then says, we're not having central coordinators. Well, one could draw a logical inference that your client really wishes that these people would die as quickly as possible. The other possibility is that they were adopted and there have been studies, and they don't have big benefits. And your client has decided, well, you know, there are these studies. It doesn't look like there are benefits. We're not adopting it. And then it would be extraordinarily difficult to infer that this was done to punish them, to punish the patients compared to people outside. So it would really help, I think, to know the answers to these questions. And the fact that the lawyers for both sides don't have any information on them is, well, disappointing. I agree with you that the record is devoid of that sort of information. And to the extent that I could offer me a couple to the court, since that's certainly of interest to you, Your Honor, is the fact that really, from my perspective, the Monell claim was a tag-along to this case in the very beginning and really wasn't even specifically articulated in the initial complaint. The focus was on the deliberate indifference claim against Dr. Malak Kermina and Nurse Mary Combs and the medical negligence claim that, by the way, remains pending in the Indiana courts. And the truth of the matter is that irrespective of how this court resolves the rather narrow issue before it on this appeal, irrespective of how this court handles that issue, Mrs. Glisson's claim against CMS, against Dr. Kermina, and against Nurse Combs will go forward to court on a medical negligence theory. We didn't even move for summary judgment on medical negligence. While it pains me as an advocate to acknowledge it, I agree that the record that Mr. Sutherland has established on behalf of Mrs. Glisson creates issues of fact with respect to medical negligence. Could I just say, I mean, I don't mean to be wasting your time, Mr. Moore, but this court sees a very large number of institutional medical care cases because there are just a lot of people in prison in our society, and that counts for Indiana and Illinois and Wisconsin as well. So coming to some clear understanding of when the provider company, whether it's CMS or Corizon or whether it's Wexford or whoever it may be, when that company might actually fall under a Monell theory is of quite general interest to the court, which is why you're standing here today. Thank you. I appreciate that, Your Honor. I think that one of the issues I was prepared to come and discuss was the issue that the majority in the panel opinion focused on, and this was the lack of evidence of an additional impact of this supposed policy on other offenders and other cases. I think it's been taken off the table by what Mr. Sutherland argued. If not, I'm certainly happy to address it. But I also wanted to address a case that I think is illustrative of how one can get to a Monell claim even when there's no evidence of a specific impact on other offenders, and that's in the Woodward claim that this court handled in, I think, about 2004. That case actually went through trial, and at trial it was determined that the company, which, by the way, happened to be Correctional Medical Services in that case as well. I'm totally lost. Why would it matter that there were or were not others? Your client has to make a decision. We either will or won't have a per-patient coordinator for medical care in prison. The decision to have one is a policy. The decision not to have one is a policy. And then we can argue about whether that policy, whichever it is, violates the Eighth Amendment, but it's very hard to see how you can argue that it's not a policy.  I will acknowledge there is no policy that CMS implements in the course of its contract with the Indiana Department of Correction to assign a single physician to be the be-all, end-all captain of the team. That's not, that's not, no. The point is, if you have someone with multiple ailments, isn't it an advantage for him to be able to go, say, to his internist and complain about something, and the internist says, well, for this particular ailment, you have to go to CX. Without being able to get information like that from your principal, you know, treatment physician, you would wander lost, right? You wouldn't know what to do. And you would have a real risk of negative interactions of treatment, you know, whether they were drugs or whether they were other therapies. So actually, on the outside, I couldn't, you know, in any authoritative way answer Judge Easterbrook's question, but I think what Judge Hamilton said about the fact that at least in the Indiana Department of Corrections, for at least seven years, it's been thought that some sort of central coordinator was the policy that ought to be followed is quite typical for people on the outside. Does the Department of Corrections have a physician in charge of anything? Currently, Your Honor, I believe that the Indiana Department of Corrections does employ some physicians primarily to help with management of the CMS contract, but in terms of the physicians providing care to the offenders, those are all physicians that are either employed by a contractor or— I gather that, but you're not even sure that they're even involved in this contract. Well, I believe that the answer is yes, that there is a medical coordinator employed by the Indiana Department of Corrections that assists with management of the contract, oversight of the contract, liaising with CMS people. With respect to this particular health care services directive, when it was promulgated, when it was enacted, I don't personally know that. So to put it in a heretical way, if we were to go to the website of the Indiana Department of Corrections and look at the personnel, would we discover the name of somebody who actually has an M.D. as one of the people in the leadership or somewhere in the department? I believe the answer is yes, that there was at least one and possibly more, again, not providing care to the offenders. I understand the difference between a policy person and a care provider. And since we're asking about personnel, as it relates to the directive, because opposing counsel said doctors actually, he thinks, came up with this directive. Do you agree with that? I honestly don't know with respect to this particular health care services directive that deals with essentially collection and documentation of chronic care needs. And the reason I make that distinction is there are certain health care services directives that deal with specific medical conditions. That's the reason for my language in the request for production response. In this particular case for Mr. Gleason, there were no health care services directives that deal with particular ailments. And I'm thinking, for example, of AIDS, HIV. There are particular health care services directives that deal with AIDS patients, patients who are on psychotropic medications. There are particular health care services directives that deal with those. Even though Mr. Gleason clearly has serious medical needs and we are not disputing that, within the range of his serious medical needs, none of those are specifically identified by a health care services directive that has to do with the types of medications and the types of specific treatment protocols. If you have someone coming into the prison who's in bad health and so on, doesn't some medical officer have it to be assigned to him? In point of fact, you're right. He's supposed to ask if he has some new symptoms. What's he supposed to do? So every single individual who comes into the Indiana Department of Correction, the first place they're housed is a facility called the Reception Diagnostic Center. The primary purpose of admission to the Reception Diagnostic Center for every single offender, not just those who have the type of fairly obvious issues that Mr. Gleason had, but every single offender is assessed from a health and mental health perspective and, if necessary, is determined to be an offender with chronic problems, which is absolutely how Mr. Gleason was identified. So then what's the next step? So he's identified as having multiple ailments or something? Sure. So the next step is, if he's identified as having multiple problems, that goes into a certain calculus from the Department of Correction's side about where that offender is housed within the department, understanding that they're facilities. This is not a matter of housing. This is a matter of treatment. So how does he find out where he's supposed to go to treat this, that, or the other one? It's multiple ailments. Respectfully, Your Honor, there is an overlay between housing and treatment. There is an overlay between housing and offenders who happen to have certain health care needs. It primarily comes up in— That's not my question. I apologize. A person comes into the prison, and he has multiple ailments, and that's determined. They're all listed. Now the question is, how does he decide whom he goes to when he has particular symptoms? So he doesn't really decide who he goes to— Could you, like, fill out a slip of paper saying I want medical care? I apologize, Your Honor. I don't mean not to. All right. How does he figure out whom he goes to with particular symptoms that he may have? Well, he goes to the same place with every symptom, and he's been sent— The same place? What's the same place? So typically he would fill out a request for health care. That would be submitted and probably initially reviewed by nursing staff, and then nursing staff would decide whether that gets sent on so that he can be assessed by a physician, a general practitioner. That's not my question. This little guy has multiple— How did he get to Dr. Hermina? How did he get to Dr. Hermina? Yeah, I think that's what Justice Kennedy said. I apologize. I don't know. How does he get to the doctor? And my question is, does Dr. Hermina remain his coordinator of all his ailments? Is that what the record reflects? Dr. Hermina does remain the coordinator of all of his ailments while Mr. Gleason is in the infirmary at Plainfield Correctional Facility. So is that who he goes to if he has one ailment versus another? So long as he is housed in the infirmary, Dr. Malak Hermina is his physician. If he is discharged to general population, there may be one or more physicians, but it's either going to be Dr. James Mozilla, who's identified in the records, or two others. I suppose he has some symptoms. Where does he go? What does he do? I don't mean to restate myself, but— That's the key thing, right? A person gets sick or has something, an accident. Usually you'd call up your primary care physician who might refer you to other people. So what is the corresponding practice for a prisoner? Initially, it is communication with the nursing staff, who then communicate on to the physician. And the communication can be accommodated by custody staff as well. In fact, in the record in this case— In other words, if one of the prisoners gets symptoms that worries him, he talks to a nurse? Yes, he initially communicates with a nurse, who is there on site to be communicated with essentially immediately. Are the doctors that the nurses talk to employees of DOC or on contract? Some are independent contractors and some are employees. It's kind of a physician-by-physician basis. All of the nursing staff are employees of Correctional Medical Services. Much of the other collateral medical staff is as well. Is there a medical director for CMS at every institution that it's at? I mean, what is the pecking order of the professional medical people? There is a regional medical director for CMS who oversees essentially the Indiana contract. And that regional medical— Mr. Moore, let me make it clear. I'm talking about on site in an incarcerated setting. Is there a supervising physician over other physicians? In terms of site assignment, there's no real pecking order. The physicians are sort of at an equal level. They do report to a regional assistant medical director and a regional medical director, who can come on site and do travel around to the different facilities. By contract? I'm sorry? By contract you're talking about. Well, the actual directors are employees of the company. Many of the physicians who are overseeing the care are considered contractors. Let me go back. Suppose Indiana—I don't know how many prison facilities the Department of Correction has. Say there's six. What medical person is in charge of the medical care for all those six institutions? Do you mean each individual institution or overall? Both. Okay. Again, there's a regional medical director who oversees the care that's provided in all of the medical facilities where CMS provides services within the state of Indiana. There is an assistant regional medical director. I'm talking about the department itself. It's all contract then. They don't have anybody. Not a DOC employee. I believe the answer to your question is that's correct. There is not a DOC employee. All we're dealing with is then when—to respond to Judge Posner's question. Once you get past the nurses, you go to a contract arrangement. You're talking about regional things and so forth. That's all under a contract. Somebody may not even be from Indiana, for example. You mean in terms of a physician? Yeah. May not be from Indiana? Well, in point of fact, I think it may be that some of our physicians who provide services at Wabash Valley actually reside in Illinois because it's close. But, I mean, they're required to be licensed Indiana physicians. Mr. Moore, is it correct that one of your company's costs of doing business is liability expenses? Certainly. The thing that really concerns me here is that given the record and the way these issues are framed in summary judgment, the position you're advocating seems to create some pretty perverse incentives for contract providers of medical care because by taking this laissez-faire approach, we're just going to let individual doctors deal with patients as they confront them. That what certainly looks like a choice to take that approach seems to be a pretty effective way of shielding both them and the company from liability in the foreseeably complex chronic cases. And I'm just very troubled by the policy consequences of the legal position you're advocating. Your Honor, that's a legitimate concern. And I'd like to address it by again noting that if the issue is failure of a remedy when physicians or nurses within the prison context fail to provide adequate medical or nursing care, then that concern will not be hampered or interfered with if this court upholds summary judgment on the Monell claim. Because you want to rely upon state malpractice remedies. I understand that. But states have great flexibility in the way they frame medical malpractice law. There are different, as was said earlier, there are different remedies available, different types of damages. There are caps on damages under Indiana law that have been historically pretty low. And so that's not really an answer to the constitutional question about whether part of the punishment of those who are chronically ill consists of deliberate neglect or failure to address the obvious consequences of their health care needs. I would simply say if the issue of disincentivizing a company like Corizon from failing to provide adequate care deals with litigation costs, again in this case, the litigation cost is really not going to be impacted by whether this court upholds summary judgment or reverses summary judgment. It will really just frankly, and the evidence won't really change, I think that Mr. Sutherland can still come in and advance this argument that these folks did not implement an adequate policy. And so not only is CMS my care as the liable for its employees, which is an avenue that's actually not available under Section 1983. Not only is that. Well, that's a different question and one that I hope this court will address in another case. I appreciate that, Your Honor. But currently, as things currently stand and in the configuration of this case, it's essentially been agreed that that's off the table. But the other issue is that there's really no substantive change in what Mrs. Glisson's recovery might be, other than, you're right, some categories of damages may or may not be available. But it will be a question of whether we try this case on the same record in the federal courthouse with one additional avenue for recovery or whether we try it in the Marion City County building just as a medical negligence claim. Whether this court treats the record in this case as giving rise to a constitutional claim or simply a medical negligence claim is significantly important because if this case, which we, again, I'd rather not, but I agree that there is at least sufficient evidence of medical negligence to make it to a jury. But if the same record gives rise to a constitutional case, it will be difficult to see how any case in which there are at least two or maybe three failures from a standard of care perspective by an individual caregiver give rise to the inference of a policy that will be a whole lot more Monell claims for our trial courts in this court. That is not this case that you're describing. The evidence of deliberate decision not to follow, it seems to me that we've got to accept that this is a permissible finding at this point, that there was a deliberate decision not to follow the state directive for coordinated care in cases, a broad category of cases that include somebody like Mr. Gleason. I disrespectfully disagree that that's an inference that the record permits, Your Honor, but thank you very much. Because the state directive didn't mandate coordinated care. It mandated site-specific policies, but it did not require a care coordinator. Correct. It required certain documentation and organization of information about care, and it required development of other types of guidelines that haven't been given to the record. And a plan that was followed that was referred to as a table of contents that would be revised over time. Agree. Agree, Your Honor. So label it what you want, but there was an idea of a single plan that included all the information about this person and also included how one was going to go forward. And treatment plans are documented throughout Mr. Gleason's record in this case, Your Honor. I don't want to, because this is the last question, it doesn't go very far, but Indiana has pushed one-year incarceration back onto local jails. Does this policy also include those people in county jails? I don't understand your question, Your Honor. In other words, you get sentenced to a year, not a year and a day, a year. You go to your local county jail, not a Department of Corrections facility, local county jail. Do these standards or whatever you call them apply? The healthcare service directive? I believe the answer to your question is no. Then you'd look back at whatever the jail expectations are. I believe that's the answer. Thank you very much. All right, thank you very much, Mr. Moore. Anything further, Mr. Sutherland? And how much time does he have? Five minutes, Your Honor. Five minutes. Let me suggest that Dr. Summers, the expert for Nicholas Gleason, stated in her opinion, which is in the record, that in her opinion, because it was fractured care and there wasn't any coordination, that directly led to his death. It's also clear— That's an indication of medical malpractice, not a constitutional violation. She wasn't qualified to talk about constitutional violations. She just said it led to his death. That's what we're talking about. I think the question was— The gap in this case, as I understand it, is a directive. A seven-year gap and then this problem. Nothing in between. I think I was addressing Judge Easterbrook's question as well. If we don't have the time, we have some references to the policy. What notice did they have that what they were doing constituted a constitutional violation? Each and every employee was looking—I'm getting to that. I can't answer it without having a little bit of time. They had a notice because they had rejected the agreement for seven years and there were a number of people that we have to presume were chronically ill and they never changed the policies. Any indication that some terrible thing happened because they didn't change the policy in those seven years? Not in this record. I don't want to create the record you did. I want to know what evidence there is that this policy— Here's the problem. I'm sorry. During that seven-year gap produced some terrible result that would put them on notice that they are not giving adequate constitutional adequate care. There is no direct evidence that there are other cases. What we're saying is that it is compared to the training cases where it's foreseeable that this is an obvious medical problem. It is an obvious medical problem according to our expert, Dr. Summers. If you look at the Thomas case or the Davis case, they had experts talking about why you need policies, why you need to address people's illnesses in a systematic way. Failure to do that can lead to serious harm or even death. In this case, there was no effort made to coordinate the care. To answer your question, Judge, there are 80 facilities in Indiana. Indiana has no medical doctors that they employ. They're all employed by Corizon. Recently, they hired away the Corizon doctor, the medical director, Dr. Midship, and he is now the only medical doctor at the top in the Department of Corrections. Before that, there were none. The person who did the directives, relying upon a broad pool of disciplines, and what I read is a nurse with a master's degree, Dr. Midship, by Alice. She passed away, so we weren't able to take her deposition. But she's the author of most of these directives. What's your notion of the minimal coordination that Corizon would be required to make? I'm sorry? What would be the minimal coordination that the prison would impose? In the facility that he was at, Dr. Khamenei was the only doctor that I'm aware of, and that's true with all the facilities. I've only found one doctor, and they come in at 6, and they leave at 2. In the whole facility? In the prison? That prison, yes. It's incredibly understaffed. And then you have people that don't speak the language that well, don't understand the cultural nuances. And here you have Mr. Nicholas Gleason, who can barely talk because he has to have a talking device, and he lost that. He didn't replace it. His head is hunched over. There's a picture in the paper of how he takes care of himself. When he is able to take care of himself, he didn't have the neck brace, so his oxygen level went down. You would think these things would be plainly aware of a need to have some coordination. So I would say the minimum coordination that you need is somebody who is in charge of his care, that looks at the overall charts. There's no indication that Dr. Khamenei did that because he's gone at 2 o'clock. He shows up, and he has a whole bunch of other patients to look at, but there's no indication. This is the sole doctor you mentioned? Yes. That's the sole doctor. And you're saying he should have, what, assigned a nurse to listen or something? What should he have done? He should have looked at the entire record from the day that Mr. Gleason came into the RBC, which is the receiving and diagnostic center. When he comes into the RBC, what should he do with every new inmate? He would have put them in acute care. That's what he should have done. Given all these medical problems, when he came back from the hospital, he should have been in acute care. They don't have that ability to do that in the prisons. They can't do it. Now, what should he have done at the beginning when Gleason is first admitted to the prison, obviously with ailments, what should this doctor do to create the minimal coordination? The doctor that sees the person or the medical person, and sometimes it's not even a medical person, takes a self-reporting history. In some cases that might work, but in Mr. Gleason's case, when he has all these medical problems— You're not answering my question. What is the doctor supposed to do when Gleason comes, you know— When he shows up at this facility, he should have got— when he shows up at the facility for the first time, he should get all the records that he has from the RBC and see what the problems were. He should have been able to track the history and see that there was no monitoring of his food intake. There was no monitoring— And then create—what your directive says is then create a treatment plan, which is modifiable over time. But, you know, you get the records, and then you figure out what you're going to do. Yeah, if you have a treatment plan and you're trying a treatment that doesn't work, then what do you want? You want the doctor to say, hey, it's not working, let's try something else, as opposed to going home at 2 o'clock. And that's the problem we have. Thank you. All right, thank you very much, Mr. Sutherland. Thank you, Mr. Moore. The court will take the case under advisement, and we will be in recess.